# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1751

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Delbert W. Barry, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: October 29, 2004
Filed: January 14, 2005

_____

Before MURPHY, HANSEN, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Delbert Barry (Barry) was charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Barry moved to suppress certain evidence, including a firearm, which Missouri police officers discovered during a search of a vehicle occupied by Barry and a companion. The district court granted Barry's suppression motion, and the government now appeals the suppression order. Concluding the district court erroneously granted the suppression motion, we reverse.

## I. BACKGROUND

At 11:18 p.m. on February 10, 2003, Sergeant Sam Brothers (Sergeant Brothers) of the Bolivar (Missouri) Police Department was on routine patrol when he noticed a parked vehicle's headlights in an alley behind a shopping mall. Sergeant Brothers found this suspicious, because it was late at night and "most of the businesses were closed," with the exception of a movie theater that may have been open at the other end of the mall. This general area had experienced some crime in the past, and several retail stores were burglarized at night. Sergeant Brothers had arrested three individuals behind a business one night for committing an armed robbery. When Sergeant Brothers drove into the mall's parking lot, the parked vehicle's headlights shut off. Sergeant Brothers proceeded into the alley and parked his marked cruiser in front of the parked vehicle. Although we cannot determine the distance separating the two vehicles, they were at least fifteen feet apart, and possibly fifteen yards apart. Sergeant Brothers did not activate his emergency lights, but kept his cruiser's headlights on.

Sergeant Brothers stated he stopped his cruiser "to find out what was going on" based on his "fear of any criminal activity or to make sure [the vehicle's occupants] were fine, make sure their vehicle hadn't broken down behind the business." As Sergeant Brothers exited his cruiser, he noticed two individuals who were standing outside the parked vehicle get into the vehicle, at which time the vehicle's headlights came back on. As Sergeant Brothers approached the vehicle, he shined his flashlight on his uniform and kept his hand on his holstered gun. Sergeant Brothers twice knocked on the passenger's window without receiving a response from the occupants. At some point, Sergeant Brothers noticed a mist inside the vehicle. When he knocked on the window a third time, the passenger rolled down the passenger-side window. With the window rolled down, Sergeant Brothers smelled marijuana and air freshener. Sergeant Brothers's training and twelve years of police experience taught him to recognize the distinctive smell of marijuana and the use of air freshener to mask the smell of marijuana.

After smelling marijuana and air freshener, Sergeant Brothers determined he had grounds to detain the occupants. Sergeant Brothers called for backup, and asked the occupants to exit the vehicle. The occupants were slow to respond, they were swaying, and their eyes were glassy and bloodshot. Sergeant Brothers determined Barry was the vehicle's owner and driver. Barry and his companion gave different reasons for being behind the mall–one said they were looking for boxes; the other said they were going to the restroom.

Barry informed Sergeant Brothers that Barry was a convicted felon. Sergeant Brothers asked Barry for consent to search the vehicle. Barry refused. Sergeant Brothers then radioed for a canine officer. When the canine officer arrived with Verus, his drug dog, Verus alerted to the driver's door handle. The officers searched the vehicle, and found a loaded Taurus PT911 9mm handgun underneath the driver's seat and a partially burned marijuana cigarette in the ashtray. The officers also found a two-way radio in the vehicle and another one in the passenger's shirt pocket. Barry was wearing a stocking hat with two freshly cut eye holes.

The federal government charged Barry with being a felon in possession of a firearm, and Barry moved to suppress the evidence seized from the search of his vehicle. After conducting a suppression hearing,[1] the magistrate judge focused his written analysis solely on "whether [Sergeant Brothers]'s intention to briefly detain [Barry] pursuant to a Terry[2] investigatory stop was based on reasonable suspicion of criminal activity." Thus, the magistrate judge did not first consider whether the

---

[1]Suppression hearings involving the search of Barry's vehicle were conducted in both state and federal court. These background facts are derived primarily from the federal court suppression hearing and the magistrate judge's recitation of the facts in his report and recommendation, with some facts being derived from the state court suppression hearing, which was Exhibit 1 in the federal court hearing.

[2]Terry v. Ohio, 392 U.S. 1 (1968).

Fourth Amendment was even implicated by the initial encounter between Sergeant Brothers and the occupants of the parked vehicle. Concluding "Sergeant Brothers lacked reasonable suspicion to conduct an investigatory stop of [Barry]'s vehicle, and that the Terry stop in this case was invalid from its inception," the magistrate judge recommended granting Barry's motion to suppress. The magistrate judge noted that "[t]o hold otherwise in this case would be tantamount to a finding that a police officer has the legal authority to make an investigative stop simply because the officer believes the vehicle is in a place it should not be, without an additional basis for believing that criminal activity is afoot."

The government filed exceptions to the magistrate judge's recommendation to suppress the evidence seized as a result of the search of Barry's vehicle. Arguing the magistrate judge erroneously decided Sergeant Brothers conducted an illegal Terry stop, as opposed to deciding the voluntary encounter did not implicate the Fourth Amendment, the government requested the district court reject the magistrate judge's recommendation. Agreeing with the magistrate judge's "thorough and well-reasoned" report and recommendation, the district court granted Barry's motion to suppress in a one-paragraph order. At no time did the magistrate judge or the district court make specific factual findings relating to the seizure issue.

The government appeals, arguing (1) Sergeant Brothers did not "stop" Barry "for Fourth Amendment purposes when he approached Barry's parked vehicle at 11:18 p.m. and asked to speak with its occupants," or (2) there was "'reasonable suspicion' to believe that Barry and his companion, who were parked in an alley behind a clothing store, and who had attempted to conceal their presence from police, had committed or were about to commit a crime." We agree the magistrate judge and the district court should have considered first whether Sergeant Brothers's initial encounter with Barry and his companion even constituted a detention implicating the Fourth Amendment. Having done so ourselves and concluding the Fourth Amendment is not implicated, we reverse and vacate the suppression order.

-4-

## II.   DISCUSSION

### A.   Standard of Review

When considering a district court's order suppressing evidence, we review the district court's conclusions of law de novo and its factual findings for clear error. See United States v. Welerford, 356 F.3d 932, 935 (8th Cir. 2004). We will affirm the district court's order granting Barry's motion to suppress "unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." See id. (citation omitted). We conclude the district court failed to apply the appropriate law when deciding to suppress the evidence seized after the search of Barry's vehicle.

### B.   Police-Citizen Encounter

The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; see United States v. Ameling, 328 F.3d 443, 447 (8th Cir. 2003) (Fourth Amendment applies to the states through the Fourteenth Amendment). Not every encounter between a police officer and a citizen constitutes an unreasonable seizure under the Fourth Amendment: "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry, 392 U.S. at 19 n.16; see also United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) ("Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'") (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976)). The Supreme Court has made it abundantly clear "that mere police questioning does not constitute a seizure." Florida v. Bostick, 501 U.S. 429, 434

(1991). For example, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." Id. (quoting Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality opinion)).

In determining whether an encounter between a police officer and a citizen constitutes a Fourth Amendment detention or seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Id. at 437 (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)); see also Mendenhall, 446 U.S. at 554 (holding "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"). This "'reasonable person' test presupposes an *innocent* person." Bostick, 501 U.S. at 438. When conducting this analysis, "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554. "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." Id. at 555. Whether a police officer subjectively believes he has detained an individual has little or no influence on our Fourth Amendment analysis, as we are called upon to "examine the facts and circumstances at the time from [the defendant]'s perspective as a reasonable person being questioned." United States v. Garcia, 197 F.3d 1223, 1226 (8th Cir. 1999).

Applying these Fourth Amendment principles to the facts of this case, we conclude Barry was not seized until Sergeant Brothers asked Barry to exit the vehicle. By that time, Sergeant Brothers had, at least, reasonable suspicion to detain Barry to investigate possible wrongdoing.

Sergeant Brothers's conduct in approaching Barry's parked vehicle and knocking on the window did not amount to a show of authority such that a reasonable person would believe he was not at liberty to ignore Sergeant Brothers's presence and go about his business. Barry's own actions belie a finding that he believed he was not at liberty to ignore Sergeant Brothers's presence. As Sergeant Brothers approached Barry's parked vehicle, Barry and his companion got into the vehicle. When Sergeant Brothers twice knocked on the vehicle's window, Barry and his companion ignored Sergeant Brothers and went about their business. Not until Sergeant Brothers knocked a third time did Barry's companion roll down the window to see what Sergeant Brothers wanted.

Up to this point, all that had occurred was Sergeant Brothers had driven his marked cruiser into the alley to see why a vehicle with its headlights on was parked in the alley at 11:18 p.m. when all of the nearby stores were closed. Up to the point when Sergeant Brothers saw a mist inside the vehicle and smelled marijuana and air freshener, Sergeant Brothers exhibited no show of authority, that is, he never raised his voice, he never drew his holstered weapon, he never activated his emergency lights, and he never ordered Barry to exit his vehicle. Sergeant Brothers had merely approached a parked vehicle, which the Fourth Amendment permits. Barry had simply encountered a police officer in a public place. No reasonable person would have believed he was seized at that point.

As for Sergeant Brothers's decision to approach the parked vehicle, Sergeant Brothers probably would have been remiss had he ignored the vehicle parked in an alley behind closed stores at 11:18 p.m. See, e.g., United States v. Angell, 11 F.3d

806, 807, 810 (8th Cir. 1993) (holding no seizure occurred where sheriff's deputy, after noticing a vehicle pull up to an unoccupied van at 1:50 a.m., shined his flashlight on the vehicle as it stopped at a stop sign, asked the occupants who they were and where they were going, asked the driver if he had been drinking, and told the vehicle's occupants to "[s]tay there, I want to talk to you," noting the deputy "would probably have been derelict in his duties had he not made such an inquiry") (abrogated on other grounds).

Barry argues he was seized based on the following facts: "[Sergeant Brothers] physically constrained Mr. Barry's movement both by how and where he parked his patrol car in relation to the front of the vehicle in which Mr. Barry was arrested, and by walking directly towards Barry's vehicle from the front of said vehicle. More significantly, [Sergeant Brothers] visibly exited a marked patrol car in uniform and came at Mr. Barry with his hand on his firearm. Finally, [Sergeant Brothers]'s testimony was clear that it was his intent to detain Mr. Barry from the moment he saw the car in the alley." We disagree. Barry is certainly correct that Sergeant Brothers drove into the alley in a marked cruiser, exited the cruiser in uniform, shined his flashlight on his uniform, and rested his hand on his holstered weapon as he approached Barry's parked vehicle. Barry is mistaken as to the significance of these facts. Sergeant Brothers's conduct does not constitute a seizure, but instead reveals a uniformed police officer on duty cautiously approaching a parked vehicle at night, in a business alley area, to question the vehicle's occupants. This approach was, without more, simply an encounter between a police officer and a citizen. Under Barry's reasoning, we wonder how Sergeant Brothers could have approached Barry's parked vehicle without implicating the Fourth Amendment. We find it implausible that parking a marked cruiser fifteen feet to fifteen yards away from a parked vehicle signifies a show of authority rather than a mere encounter.

Finally, we do not rely on Sergeant Brothers's subjective beliefs as to the constitutional nature of his conduct when he approached Barry's vehicle, i.e., it

makes little difference if Sergeant Brothers believed he had the right to detain individuals engaged in wrongdoing. Cf. United States v. Waldon, 206 F.3d 597, 603 (6th Cir. 2000) ("We know of no legal precedent suggesting a police officer can engage in a consensual encounter only with citizens whom he does not suspect of wrongdoing.") (citing Whren v. United States, 517 U.S. 806, 813 (1996)). Instead, we focus on whether a reasonable person in Barry's position would believe he was not free to leave based on Sergeant Brothers's show of authority. We conclude no reasonable person would have felt seized as the Fourth Amendment contemplates.

The law books disclose numerous cases supporting our conclusion. For example, in United States v. Baker, 290 F.3d 1276, 1277 (11th Cir. 2002), two plain-clothed police officers approached a running vehicle stopped at an intersection, displayed their badges, asked the vehicle's occupants to roll down the window, and questioned the occupants. Based on these facts, the Eleventh Circuit addressed an "issue of first impression in this circuit[:] whether the interaction between the police and the individuals in the car that was neither parked nor moving was a consensual encounter under the Fourth Amendment." Id. at 1278. The court held there was no seizure under the Fourth Amendment because the police officers "did not make a sufficient show of authority to sufficiently convey to [the vehicle's occupants] that [their] liberty was restrained." Id. at 1279. In reaching this decision, the court relied on the following factors: the vehicle was already stopped; the officers displayed their badges only to identify themselves as police officers; the officers never told the occupants to turn off their engine; the officers asked to speak with the occupants while they were still inside the vehicle; and the officers never displayed a weapon or used a threatening tone. Id.

In another example, the Supreme Court of Alabama confronted a similar factual situation in Ex Parte Betterton, 527 So.2d 747 (Ala. 1988). In Betterton, three males were seated in the front seat of a vehicle parked in front of an empty vehicle in a city park at 1:40 a.m. When police officers spotted the vehicles, they approached the

occupied vehicle to see if they "could help them with anything or if they were having trouble or what they were doing." Id. at 748. The area where the vehicles were parked was not a high-crime area and there was nothing unusual about the vehicles being parked there at 1:40 a.m. The police officers parked their cruiser behind or to the side of the parked vehicles, shined their bright lights on the vehicles, walked up to the occupied vehicle, and knocked on the driver's window. When the driver opened the window, the police officers smelled marijuana. At that point, the police officers ordered the occupants out of the car. The Alabama Supreme Court asked "whether a 'stop' or 'seizure' occurred prior to the point at which the police officers directed the [occupants] to get out of the car in which they were sitting." Id. Noting the vehicle "was already stopped and parked in a public park" and "the officers merely approached a car parked in a public place," the court held "such action did not amount to such a show of authority or implied restraint as to amount to a seizure." Id. at 749-50.

Our decision in this case–that Barry was not detained or seized until he was removed from his vehicle–is wholly consistent with the Eleventh Circuit's decision in Baker, the Alabama Supreme Court's decision in Betterton, and with scores of other cases holding similar police-citizen encounters did not implicate the Fourth Amendment. See, e.g., United States v. Gipp, 147 F.3d 680, 684-85 (8th Cir. 1998) (holding a highway patrol officer can approach a parked vehicle on a frontage road at 7:45 p.m. to see if there are any problems without offending the Fourth Amendment); United States v. Dockter, 58 F.3d 1284, 1287 (8th Cir. 1995) (ruling that individuals "were not seized within the meaning of the Fourth Amendment when [a sheriff's deputy] pulled his vehicle [directly] behind their parked car and activated his amber warning lights"); United States v. Kim, 25 F.3d 1426, 1430 n.1 (9th Cir. 1994) (recognizing other circuit courts "have consistently held that an officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure"); Commonwealth v. Eckert, 728 N.E.2d 312, 316 (Mass. 2000) (concluding "that, by walking up to the defendant's

parked vehicle at the rest area, knocking on the window, shining his flashlight inside and asking whether the defendant was 'all set,' [a state trooper] did not engage in any conduct that requires constitutional justification, as he neither asserted nor implied that the defendant was not free at that moment to ignore this inquiry into his well-being").

Finally, we can infer numerous constitutional reasons for a police officer to approach a parked vehicle at 11:18 p.m. in an alley behind a shopping mall where nearly all the stores are closed and where some stores had been burglarized in the past. We can also envision a police officer approaching such a vehicle to ensure the safety of the vehicle's occupants. As is abundantly clear from Fourth Amendment jurisprudence, police-citizen encounters are part of life, and such encounters only implicate the Constitution when a police officer exerts his authority in such a way that the officer restrains a citizen's liberty. The Constitution was not implicated by the initial encounter between Sergeant Brothers and Barry.

## C.     Probable Cause to Search

Even though the initial encounter between Sergeant Brothers and Barry did not implicate the Fourth Amendment, later events clearly did. It is beyond dispute Sergeant Brothers detained Barry once he saw the mist inside the vehicle and smelled the air freshener and marijuana. Did any of Sergeant Brothers's actions after this point violate Barry's Fourth Amendment rights such that we must exclude the evidence seized from the search of Barry's vehicle? No. Once Sergeant Brothers saw the mist inside the vehicle and smelled the marijuana and air freshener, he had, at a minimum, reasonable suspicion to detain Barry. See Gipp, 147 F.3d at 685 (holding that, "after [a police officer] smelled burnt marijuana emanating from appellant's clothes and the interior of appellant's car, he had a 'particularized and objective basis' for suspecting appellant was or had recently engaged in criminal activity, that is, using marijuana") (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

As events unfolded, Sergeant Brothers gained the authority to make a warrantless search of Barry's vehicle based on probable cause because, "given the totality of the circumstances, a reasonable person could believe there [was] a fair probability that contraband or evidence of a crime would be found in" Barry's vehicle. United States v. Brown, 345 F.3d 574, 580 (8th Cir. 2003) (citation omitted). After Barry and his companion exited the vehicle and answered a few questions, the evidence became overwhelmingly supportive of probable cause to search the vehicle. Sergeant Brothers (1) had observed a mist inside the parked vehicle; (2) had smelled marijuana and air freshener emanating from the vehicle; (3) observed Barry's and his companion's eyes were glassy and bloodshot, and both men were swaying and slowly responding to questions; (4) heard Barry and his companion give different stories for being in the alley behind closed stores at 11:18 p.m.; and (5) knew Verus, the drug dog, had alerted to the driver-side door handle. This conclusion is undoubtedly consistent with our court's long-standing precedent. See, e.g., United States v. Winters, 221 F.3d 1039, 1042 (8th Cir. 2000) (finding probable cause supported the search of a vehicle in which a state trooper smelled raw marijuana); United States v. Peltier, 217 F.3d 608, 610 (8th Cir. 2000) (concluding "the smell of marijuana gave the deputy probable cause to search [the defendant]'s truck for drugs"); United States v. Caves, 890 F.2d 87, 89-91 (8th Cir. 1989) (holding the totality of the circumstances, including the smell of marijuana on the defendant's person, allowed a warrantless search of the defendant's vehicle based on probable cause).

## III.  CONCLUSION

For the foregoing reasons, we reverse the district court's grant of Barry's motion to suppress, vacate the suppression order, and remand for further proceedings consistent with this opinion.

_____